**KELLEY DRYE & WARREN LLP**
   Tahir L. Boykins (State Bar No. 323441)
10100 Santa Monica Boulevard
23rd Floor
Los Angeles, CA 90067-4008
Telephone:  (310) 712-6100
Facsimile:  (310) 712-6199
tboykins@kelleydrye.com

Attorneys for Defendant
DriveWealth, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DRIVEWEALTH, LLC | Case No. 19-10550 |
| Plaintiff, | |
| v. | **COMPLAINT FOR INJUNCTION IN AID OF ARBITRATION** |
| ELECTRONIC TRANSACTION CLEARING, INC., APEX CLEARING CORP., AND PEAK6 INVESTMENTS, LLC | |
| Defendant. | |

Plaintiff DriveWealth, LLC ("Plaintiff' or "DriveWealth") by and through its attorneys, Kelley Drye & Warren LLP, as and for its Complaint for Injunction in Aid of Arbitration against Defendants Electronic Transaction Clearing, Inc. ("ETC"), Apex Clearing Corp. ("Apex"), and/or PEAK6 Investments, LLC ("PEAK6")  (collectively referred to herein as "Defendants") alleges as follows:

## THE PARTIES

1.  Plaintiff DriveWealth is a limited liability company duly organized under the Laws of New Jersey with its principal place of business at 97 Main Street, Chatham, NJ 07928.

2.  Defendant ETC is a corporation duly organized under the laws of Delaware with its principal place of business at 660 S. Figueroa Street Suite 1450, Los Angeles, CA 90017.  Upon information and belief, ETC is directly or indirectly owned (75% or more) by PEAK6.

3.  Defendant Apex is a corporation duly organized under the laws of New York with its principal place of business at One Dallas Center, 350 N. St. Paul, Suite 1300, Dallas, TX 75201.  Defendant Apex is licensed and transacts business within the state.   Upon information and belief, Apex is directly or indirectly owned (75% or more) by PEAK6.

4.  Defendant PEAK6 is a company duly organized under the laws of Delaware with its principal place of business at 141 W. Jackson Blvd. Suite 500 Chicago, IL 60604.  Defendant PEAK6 is licensed and transacts business within the state.

## JURISDICTION AND VENUE

5.  This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

6.  Venue is proper in this District and before this Court, pursuant to 28 U.S.C. § 1391, because Defendant ETC resides in this district and a substantial part

1  of the events giving rise to the claims asserted herein occurred in this district.

2         7.     Plaintiff is required to arbitrate this dispute pursuant to Rule 13200(a)

3  of the Financial Industry Regulatory Authority ("FINRA") Code of Arbitration

4  Procedure for Industry Disputes (hereinafter "Industry Code"). Plaintiff filed this

5  action for the limited purpose of seeking a Temporary Restraining Order and

6  Preliminary Injunction against Defendants to preserve the status quo pending the

7  outcome of that arbitration. *PMS Distrib. Co. v. Huber & Suhner, A. G.*, 863 F.2d

8  639, 641-42 (9th Cir. 1988).

9  **GENERAL ALLEGATIONS**

10  **The Roles of the Parties**

11         8.     DriveWealth is a privately held, successful, stable and growing

12  clearing firm that provides a platform for introducing firms to enter securities trades,

13  in equities, exchange-traded fund (ETFs), and American depositary receipts

14  (ADRs).

15         9.     DriveWealth is a broker-dealer registered with the SEC and a member

16  of FINRA, and in connection with the instant dispute, is the clearing firm.

17        10.    DriveWealth provides access to the U.S. markets and services for U.S.

18  and foreign registered introducing broker-dealers and registered investment

19  advisors.

20        11.    An introducing broker ("IBs"), or correspondent, is a broker in the

21  securities markets who maintains a relationship with its retail customers, but

22  delegates the work of the floor operation and trade execution to its clearing firm

23  which handles all back office aspects of the securities transactions.

24        12.    Among other things, IBs provide necessary means for customers to

25  place trades, either via a front-end customer interface, or, in the more traditional

26  model, via a designated account executive, and introduce the customer to the

27  clearing firm which provides the necessary back office functions for the customer

28  relationship.

COMPLAINT FOR INJUNCTION IN AID OF ARBITRATION

1    13.   In connection with the instant dispute, the IBs are DriveWealth's

2    customers, each of which has its own platform to allow the end-user client to enter

3    trades.  DriveWealth offers technology allowing its customers the ability to custom

4    tailor offerings to the end-user client, such as offering real time fractional share

5    trading.

6    14.   DriveWealth's business offers a low risk business profile. DriveWealth

7    offers only securities listed on the NYSE and NASDAQ that meet rigorous listing

8    requirements, ETFs, and ADRs. The majority of DriveWealth's business is for

9    customers who buy and pay for quality securities in cash accounts governed by

10   Regulation T, 12 CFR §220.  A de minimus portion of the assets under management

11   by DriveWealth is in margin accounts.

12   15.   As a securities broker-dealer that is not "self-clearing" (i.e., is not a

13   member of the Depository Trust and Clearing Corporation (the "DTCC") and

14   therefore does not hold customer securities or property), DriveWealth is required,

15   and contracts to engage, the services of a clearing firm for purposes of custodial

16   services with the DTCC ("DTC Custodian").

17   16.   For DriveWealth, the DTC Custodian is necessary to hold the securities

18   that are traded, and DriveWealth maintains an account with such DTC Custodian on

19   an omnibus basis.  Without the services of a DTC Custodian, the buy and sell orders

20   placed by customers of IBs would not be executed or completed, and DriveWealth

21   could not conduct its business.

22   17.   In exchange for performing these essential services for Clearing Firms,

23   DTC Custodians charge fees and earn revenue on the balances they hold.  DTC

24   Custodians also generally require the Clearing Firms to provide liquid security (e.g.,

25   cash or securities) against risk by depositing a set amount of money with the DTC

26   Custodian, which is frequently referred to within the industry as a Clearing Deposit.

27   18.   It is standard for DTC Custodians to establish the amount of each

28   Clearing Deposit by examining the Clearing Firm's: (i) mix of business; (ii)

COMPLAINT FOR INJUNCTION IN AID OF ARBITRATION

customer base; (iii) capitalization; and (iv) history of operations.  The greater the risk posed, the higher the Clearing Deposit.

19.     Prior to 2017, DriveWealth contracted with the Industrial and Commercial Bank of China Financial Services ("ICBCFS") to act as its DTC Custodian.  Beginning on or about August 22, 2017, DriveWealth began negotiating with ETC in order to transition the business from ICBCFS to ETC.  Those negotiations were consummated in the Omnibus Clearing Agreement, dated November 1, 2017 (the "2017 OCA").  DriveWealth finished transitioning its business from ICBCFS to ETC on approximately May 14, 2018.  For the most part, the relationship was satisfactory to DriveWealth.

20.     Significantly, DriveWealth's customers never defaulted or reneged on any trades and there was no rogue trading.  No customer complaints or arbitrations were threatened, much less commenced.

21.     Despite the absence of any added economic or regulatory risk to ETC, on or about January 24, 2019, ETC and DriveWealth entered into an addendum to the 2017 OCA which, inter alia, increased the Clearing Deposit, but left other fees unchanged from the 2017 OCA.  DriveWealth was not happy with, and saw no risk based reason for this addendum, but agreed to it so as to not disrupt the stability of its customers' ability to conduct business in their accounts.

22.     In or about March 2019, ETC and DriveWealth began to renegotiate the terms of the 2017 OCA, and after 5 months of negotiations, ETC and DriveWealth executed a new Omnibus Clearing Agreement, dated August 5, 2019 (the "August 2019 OCA").

23.     As part of the August 2019 OCA, ETC and DriveWealth agreed on a Pricing Schedule.

24.     On or about September 9, 2019, Defendant PEAK6 acquired ETC and brought it under the control of Defendant Apex, an existing subsidiary of PEAK6 and a primary competitor to DriveWealth.  It appears that ETC and Apex are

1   operating as a joint venture and are sharing offices and employees in their dealings

2   with DriveWealth.  As described in the press release

3   (https://www.prnewswire.com/news-releases/peak6-acquires-electronic-transaction-

4   clearing-300913915.html):

> ETC's institutional orientation will expand PEAK6's
> footprint in custody and clearing and is a direct
> complement to one of its core businesses, Apex Clearing,
> which is primarily focused on the retail marketplace. The
> transaction will align ETC and Apex, two firms with a
> shared mission to improve foundational financial
> processes with technology, and position both organizations
> as alternatives to traditional custodians through the
> delivery of flexible, customizable, digital solutions that
> facilitate speed and innovation.
>
> "We look forward to exploring how stronger alignment
> between the ETC and Apex Clearing brands can result in
> growth and expansion for both companies and their
> respective clients," said Bill Capuzzi, partner at PEAK6
> and Chief Executive Officer of Apex Clearing.
> "Combining each firm's distinct philosophy of leveraging
> technology to enhance service and increase efficiency will
> strengthen our commitment to leading the digital
> revolution in custody and clearing."

  25. Defendant Apex, a subsidiary of Defendant PEAK6 and, as of

September 9, 2019, a sister company to Defendant ETC, is a primary competitor to

DriveWealth in the US marketplace.

**Immediately Following The Purchase of ETC By PEAK6, Defendants**

**Demanded DriveWealth Agree to Exorbitant Price Increases and Later**

**Threaten to Terminate the August 2019 OCA and Restrict DriveWealth's**

**Account Access**

  26. Immediately following the acquisition of ETC, on September 12, 2019,

the CEO of Apex and Chairman of PEAK6 ETC Holdings LLC and advisor to ETC,

William Capuzzi, emailed Robert Cortright, the CEO of DriveWealth, stating that

"the current pricing for DriveWealth[] is well below industry standards" and

requested that DriveWealth agree to a revised pricing schedule, notwithstanding that

DriveWealth and ETC had negotiated these prices just one month before.

27.     DriveWealth's business mix and risk profile had not changed and in fact have remained consistent and stable throughout the contractual relationship.

28.     On September 23, 2019, Mr. Cortright responded, declining to amend the schedule, stating:

> The [August 2019 OCA] was the result of months of balanced negotiations between the parties. We believe that the final contract addressed the business needs of both ETC and DriveWealth in a fair and reasonable manner.

29.     Three days later, on September 26, 2019, Mr. Capuzzi threatened to terminate the August 2019 OCA if DriveWealth did not capitulate to the revised pricing schedule by October 1 – three business days later.

30.     On October 1, 2019, William Brennan, CEO of ETC and also a registered employee of Apex, sent an email attaching the proposed revised pricing schedule and stating (emphasis added):

> Please note that the new pricing schedule will become effective in 60 days. <u>To the extent that your contract contains an auto-renewal provision, this constitutes notice of non-renewal or termination as applicable,</u> although we hope our relationship will continue on the new terms.

31.     The proposed revised pricing schedule contained material increases and more than tripled the monthly minimum payment due to ETC under the August 2019 OCA.

//

//

//

//

//

//

//

| Category | August 2019 OCA Pricing Terms | October 1, 2019 Proposed Terms | Percentage Change |
|---|---|---|---|
| Term | One Year; automatic one-year renewals | 3 years | 200% |
| Monthly Minimum | $12,500 | $50,000 | 300% |
| Retail Equity Trades | Between $0.000075 and $0.000125 per share with no minimum charge per trade | $0.002 per share with a $0.25 minimum per trade | ~1500% to ~2567% on per share charge only |
| Clearing Deposit | $250,000 | $250,000 to $500,000 | 100% |

32.     During the following six weeks, the parties met in person and exchanged multiple emails regarding the pricing proposal and purported notice of termination.  Moreover, during this period, DriveWealth conducted price discovery with other counterparties and determined that the October 1, 2019 pricing proposal from ETC was not only not in line with industry rates, but was not what Apex/ETC was quoting to other counterparties.

33.     Thus, it was apparent that despite conciliatory language in their termination letters, Defendants were not in fact interested in continuing to do business with DriveWealth, unless Defendants could triple their rates and guaranteed monthly minimum revenue.

34.     On or about November 15, 2019, DriveWealth advised all Defendants that it would be transitioning its clearing business to Citibank, N.A.

35.     On November 20, 2019, Mr. Brennan confirmed receipt of the transition notice, and confirmed that "de-conversions take time and effort so please contact us as soon as possible to coordinate to ensure that the transfer goes

1  smoothly. As we indicated previously, the new pricing will apply to any account
2  that remains at ETC after the termination date."

3       36.    Notwithstanding that acknowledgement, Mr. Brennan, on the afternoon
4  of Wednesday November 27, 2019, the day before the Thanksgiving holiday,
5  emailed Mr. Cortright (with a copy to Mr. Capuzzi of Apex, at an ETC email
6  address), demanding that the conversion be complete by December 13, 2019, or
7  ETC may limit[] the account to no new positions or closing position only."  Mr.
8  Brennan also threatened to limit the account if the total assets held in DriveWealth's
9  omnibus account at ETC exceeded $355 million.

10       37.    On Saturday, November 30, 2019, DriveWealth responded to the
11  November 27, 2019 email, recounting the timeline, reiterating its desire to promptly
12  transition to Citibank, and proposing a meeting for December 3 or December 4 to
13  "begin mapping out a conversion plan."

14       38.    On December 2, 2019, ETC reiterated its position that the transition
15  "should" be complete by December 13, 2019, contended that the August 2019 OCA
16  was terminated, and that the proposed – but never agreed to – pricing was in effect.

17       39.    Despite its position that ETC does not have the right to unilaterally
18  change pricing one month after the new 12-month term began, in an effort to protect
19  itself and its customers, on December 4, 2019, DriveWealth proposed a 3 or 6
20  month contract, at the pricing terms proposed by ETC, in order to ensure that the
21  transition to Citibank could be effectuated smoothly.  On December 5, 2019,
22  Defendants rejected this proposal, demanding a 1-year commitment.

23       40.    On December 6, 2019, Defendants advanced their already arbitrary and
24  capricious deadline from December 13 to December 11.  Notably, the December 6
25  correspondence from William Brennan to Robert Cortright, was transmitted with
26  inline edits made by Jay Coppoletta, Legal Officer at PEAK6.
27  //
28  //

## Defendants' Actions Threaten The Very
## Existence of DriveWealth's Business

41.     Defendants know that DriveWealth cannot conduct business without a DTC Custodian.

42.     Defendants' threats are serious and threaten to put DriveWealth out of business.  Any limitations placed on DriveWealth's account will necessarily mean that DriveWealth's IBs and, thus, the end retail customers will not be able to fully trade their own accounts.  Even a temporary inability of this nature will likely result in many of DriveWealth's existing correspondents moving to a competitor – potentially to Defendant Apex, while harming DriveWealth's ability to create relationships with new IBs and causing DriveWealth to be unable to service accounts for new and existing retail customers.  This inability to fully trade existing accounts and open new accounts will have a variety of regulatory implications, and will quickly destroy DriveWealth's business.

43.     On December 10, 2019, Plaintiff sought a temporary restraining order ("TRO") from Justice O. Peter Sherwood of the Supreme Court of the State of New York. Recognizing the exigencies of the situation, Justice Sherwood issued a TRO, in pertinent part, as follows:

> **ORDERED** that pending the hearing in the State or Federal Court in Los Angeles, California on this order to show cause, Respondents, and all those acting in active concert with them, directly or indirectly, shall be enjoined from taking any action during the pendency of the Arbitration that would otherwise interfere with Petitioner's right to continue to conduct its business and to obtain services under the August 2019 OCA in the same manner and at the same fees as it has done since the inception of the August 2019 OCA.  This paragraph shall expire on 12/16/19 at 11:00pm, EST unless extended by order of the California Court.

44.     The TRO was made subject to extension by the Courts in California following Defendant's counsel's representation that all three Defendants would be amenable to the jurisdiction of the State or Federal Court in Los Angeles County.

1    45.    DriveWealth believes that Defendants' threats are genuine and that

2    absent the entry of a temporary restraining order, DriveWealth's business will be

3    substantially and irreparably harmed on Monday, December 16, 2019, or sooner.

4    **FIRST CAUSE OF ACTION**

5    **(INJUNCTIVE RELIEF PENDING ARBITRATION)**

6    46.    DriveWealth re-alleges Paragraphs 1 through 45, inclusive, as though

7    set forth in full.

8    47.    DriveWealth and ETC, now controlled by Defendants PEAK6 and

9    Apex, are parties to the August 2019 OCA.

10   48.    DriveWealth has fully and faithfully performed under the August 2019

11   OCA, including its payment obligations to Defendants.

12   49.    The August 2019 OCA provides the following term and termination

13   provision, in relevant part:

14   a) The parties agree that this Agreement shall be in force
     for a period of twelve (12) months from the Effective Date

15   ("Contract Period") and that there shall be no change in
     the pricing schedule referred to in Paragraph 3 herein.

16   Thereafter, the Agreement shall automatically renew for a
     subsequent Contract Period, unless terminated pursuant to

17   the terms of section 13(b) below.

18   (b) This Agreement may be terminated by either party,
     without cause, upon sixty (60) days' written notice to the

19   other party, prior to the expiration of the then current
     Contract Period. Should Introducing Broker fail to provide

20   timely notice, Introducing Broker may thereafter terminate
     this Agreement at any time during the Contract Period, but

21   agrees that it shall be liable and will pay to ETC all agreed
     upon minimums for the remainder of the Contract Period.

22

23   50.    Thus, by its own terms, the initial Contract Period of the August 2019

     OCA was to run from August 5, 2019 until August 5, 2020.  During that initial
24
     Contract Period "*there shall be no change in the pricing schedule*" (emphasis
25
     added).  Pursuant to the August 2019 OCA, "*[t]hereafter*" (emphasis added) the
26
     2019 OCA would automatically renew for another year, unless terminated no less
27
     than 60 days "prior to the expiration of the then current Contract Period."
28

10

COMPLAINT FOR INJUNCTION IN AID OF ARBITRATION

51.     The August 2019 OCA does not provide for termination during a Contract Period.  Rather, the contract allows either party to decline the automatic renewal by providing notice by June 6, 2020 (60 days before the end of each Contract Period).

52.     ETC has no contractual power to terminate the August 2019 OCA without cause at the very outset of a Contract Period, and thus, ETC is contractually required to provide DriveWealth with clearing services at the contracted rates up through and including August 5, 2020.

53.     There is no provision in the August 2019 OCA permitting Defendants to opt-out, or otherwise unilaterally demand that DriveWealth accept radically different new financial terms more favorable to Defendants to continue to receive the benefit of DriveWealth's bargain.

54.     The August 2019 OCA does not permit Defendants to withhold performance, or otherwise alter the August 2019 OCA's terms, in retaliation for DriveWealth's refusal to accept new financial terms more favorable to Defendants.

55.     Defendants' actions, as described, constitute a breach of the August 2019 OCA.

56.     Defendants' breach of the August 2019 OCA threatens to destroy DriveWealth's business, and cause chaos for DriveWealth's retail brokerage customers who collectively maintain more than 1.5 million retail accounts with DriveWealth.

57.     As such, money damages are an insufficient remedy.

58.     If Defendants' continued efforts to breach the August 2019 OCA are not enjoined in order to maintain the *status quo* pending the outcome of a contractual arbitration, then DriveWealth will suffer significant irreparable harm, including potentially going out of business, and the meaningfulness of the arbitration will be vitiated.

59.     Plaintiff has initiated an arbitration as required by FINRA Rule

13200(a) of the Industry Code.  The instant Complaint is necessary to obtain a Temporary Restraining Order and Preliminary Injunction against Defendants to preserve the status quo pending the outcome of that arbitration.

## **PRAYER FOR RELIEF**

**WHEREFORE,** DriveWealth, LLC respectfully requests the Panel grant the following relief:

(a)     An injunction enjoining Defendants, and all those acting in active concert with them, directly or indirectly, from breaching the August 2019 OCA, unilaterally altering or changing the terms of the August 2019 OCA, and from otherwise interfering with DriveWealth's right to continue to conduct its business under the terms of the August 2019 OCA during the balance of its term, including maintaining the same new account and margin extension standards and parameters, as it has done since the inception of the August 2019 OCA, until such time as a FINRA arbitration panel has an opportunity to hold a hearing and issue a decision on DriveWealth's request for permanent injunctive relief in accordance with Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes; and

(b)     An award of such other or additional relief as this Court deems just, equitable and proper.


DATED: December 13, 2019

KELLEY DRYE & WARREN LLP
Tahir L. Boykins

By:    */s/ Tahir L. Boykins*
          Tahir L. Boykins
Attorneys for Defendant
DriveWealth, LLC

COMPLAINT FOR INJUNCTION IN AID OF ARBITRATION