**KELLEY DRYE & WARREN LLP**
  Tahir L. Boykins (State Bar No. 323441)
10100 Santa Monica Boulevard
23rd Floor
Los Angeles, CA 90067-4008
Telephone:  (310) 712-6100
Facsimile:   (310) 712-6199
tboykins@kelleydrye.com

Attorneys for Defendant
DriveWealth, LLC

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DRIVEWEALTH, LLC<br><br>Plaintiff,<br><br>v.<br><br>ELECTRONIC TRANSACTION CLEARING, INC., APEX CLEARING CORP., AND PEAK6 INVESTMENTS, LLC<br><br>Defendant. | Case No. 19-10550<br><br>**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER IN AID OF ARBITRATION AND MEMORANDUM IN SUPPORT** |

**TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Plaintiff DriveWealth, LLC ("Plaintiff" or "DriveWealth"), moves this Court for issuance of a temporary restraining order in aid of arbitration to stop the Defendants Electronic Transaction Clearing, Inc. ("ETC"), Apex Clearing Corp. ("Apex"), and/or PEAK6 Investments, LLC ("PEAK6") (sometimes hereinafter collectively referred to as "Defendants") from disrupting the *status quo* of the Parties obligations pursuant to the Omnibus Clearing Agreement, dated August 5, 2019 (the "August 2019 OCA").

On December 10, 2019, following oral argument, Plaintiff obtained a temporary restraining order ("TRO") from Justice O. Peter Sherwood of the Supreme Court of the State of New York. Recognizing the exigencies of the situation, Justice Sherwood issued a TRO, in pertinent part, as follows:

> **ORDERED** that pending the hearing in the State or Federal Court in Los Angeles, California on this order to show cause, Respondents, and all those acting in active concert with them, directly or indirectly, shall be enjoined from taking any action during the pendency of the Arbitration that would otherwise interfere with Petitioner's right to continue to conduct its business and to obtain services under the August 2019 OCA in the same manner and at the same fees as it has done since the inception of the August 2019 OCA. This paragraph shall expire on 12/16/19 at 11:00pm, EST unless extended by order of the California Court.

The TRO was issued subject to extension by the Courts in California following Defendants' counsel's representation that all three Defendants would be amenable to the jurisdiction of the State or Federal Court in Los Angeles County.

If this Court does not issue a temporary restraining order by 11:00pm EST on Monday, December 16, 2019 and Defendants are permitted to disrupt the status quo and breach the terms of the August 2019 OCA, DriveWealth's business operations stand to be destroyed as it will be at risk of losing the majority, if not all, of its customer base. Such an injury is irreparable as it cannot be measured in monetary damages.

All parties are members of, and subject to mandatory arbitration of industry disputes before, the Financial Industry Regulatory Authority ("FINRA"). Plaintiff has initiated a simultaneous arbitration with FINRA's Office of Dispute Resolution as required by FINRA Rule 13200(a) of the Industry Code. The TRO against Defendants is necessary to preserve the status quo pending the outcome of that arbitration.[1]

As agreed between the parties, DriveWealth has given notice to Defendants by serving a copy of DriveWealth's Complaint, this Motion and supporting papers to Mark G. Hanchet, counsel for Defendants.

DATED: December 13, 2019

KELLEY DRYE & WARREN LLP
Tahir L. Boykins

By: /s/ Tahir L. Boykins
    Tahir L. Boykins
Attorneys for Defendant
DriveWealth, LLC

---

[1] All parties are FINRA member firms and are required under FINRA's rules to arbitrate any legal disputes they might have relating to their securities business, and section 14(B) of the August 2019 OCA contains a broad FINRA arbitration clause. FINRA's industry arbitration Rule 13804 specifically authorizes any industry party in a clearing dispute to seek preliminary injunctive relief from a court, the issuance of which triggers a rapid arbitral hearing on permanent injunctive relief within 15 days. Thus, following the issuance of a TRO by this Court, the FINRA process should obviate the need for additional judicial intervention.

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Prior to the filing of this action, on December 9, 2019, DriveWealth filed a Statement of Claim with the Case Administrator at the FINRA Dispute Resolution. DriveWealth now brings this motion for a temporary restraining order in aid of arbitration to prohibit Defendants from materially altering the parties' present clearing relationship until the matter is resolved before an expedited arbitration conducted by industry arbitrators appointed by the FINRA Dispute Resolution Case Administrator. FINRA Code of Arb. Proc. §§ 13402(a)(1) and 13804(b)(1).

On or about August 5, 2019, DriveWealth and ETC executed an Omnibus Clearing Agreement (the "August 2019 OCA") which was to be in full force and effect for 1 year, and automatically renew thereafter unless notice was given no less than 60 days before the end of the then current 1-year contract period. During each contract period, the price schedule was to remain unchanged. Less than one month after DriveWealth and ETC signed the August 2019 OCA, and just three days after PEAK6 purchased ETC, and along with its subsidiary Apex – a major competitor to DriveWealth – the Defendants began to engage in a series of predatory business practices. Indeed, the conduct of Defendants toward DriveWealth since PEAK6 and Apex became affiliated with ETC has been egregious, and solely designed to destroy DriveWealth's business and benefit Defendants without any regard for their obligations, contractual and otherwise, to DriveWealth, or the more than 1.5 million retail securities accounts maintained by DriveWealth's customers.

Defendants have demonstrated a plan to force DriveWealth to choose between two types of poison: 1) lose the benefit of the negotiated terms agreed to in the renewal of the contract with ETC and enter into a new clearing agreement with terms highly favorable to ETC, including an extortionate clearing deposit even when there has been no change in the broker-dealer's business risk profile the clearing deposit is intended to secure, or 2) face immediate draconian restrictions on

customer accounts, risking irreparable harm to DriveWealth's entire business. DriveWealth refuses to make this Hobson's choice. As a result, DriveWealth's very existence is likely dependent on the issuance of the injunction prayed for by DriveWealth.[2]

Nor have Defendants identified *any* non-frivolous rationale for their demands. In response to repeated requests for such rationale, Defendants have identified three reasons for their purported need to renegotiate the August 2019 OCA: (i) the agreed-upon rates were below market value; (ii) there was a change in the risk profile of the DriveWealth account; and (iii) certainty is needed now that DriveWealth has announced it is changing DTC Custodians. None of these reasons have merit – and certainly none would outweigh the damage that would be caused if Defendants limit DriveWealth's account access, damaging its business and preventing more than 1.5 million end users from being able to fully trade in their personal accounts.

Because of Defendants' threats, DriveWealth advised Defendants that it would be transitioning its business by the end of January 2020. Not content with that timetable – despite that such transition is a time consuming endeavor that must be done carefully to ensure that user accounts are protected and secure at all times – Defendants sought to enforce an arbitrary conversion deadline of December 13, 2019. ETC and DriveWealth have been in business together since 2017 without any incidents or issues. Nevertheless, it took only three (3) days after the PEAK6

---

[2] This is not the first time that Defendants, specifically Apex, has attempted these predatory business practices. In 2012, A New York Court promptly enjoined Apex from such predatory business practices through the issuance of a temporary restraining order. In the prior 2012 FINRA arbitration, *TradeKing, LLC v. Pension Financial Services Inc. and Apex Clearing Corp.*, after negotiating a clearing agreement with then petitioner TradeKing, LLC, Apex attempted to raise certain fees and deposits, and threatened account restrictions if TradeKing suddenly and dramatically failed to acquiesce. A state court in Dallas, TX also issued a TRO against APEX arising out of similar facts in *Zecco Trading, Inc. v. Apex Clearing Corporation, Penson Financial Services, Inc., and Optionshouse, LLC,* Index No. DC-12-06676. Copies of these TROs are attached as Exhibits C and D to the Declaration of Tahir L. Boykins, dated December 13, 2019 (hereinafter the "Boykins Dec.").

purchase for Apex's CEO to target DriveWealth and attempt to either extort additional funds or damage their competition's business. After 2 years of stable, calm and compliant business, the facts weigh in favor of the relief requested by DriveWealth – a short TRO to allow the conversion to be completed without impacting the more than 1.5 million end users and to allow the FINRA arbitration to proceed.

## STATEMENT OF FACTS

Plaintiff DriveWealth is a privately held, successful, stable and growing clearing firm that provides a platform for introducing firms to enter securities trades, in equities, ETFs and ADRs. As a securities broker-dealer, DriveWealth is registered with and subject to the supervision of, *inter alia*, the United States Securities and Exchange Commission (S.E.C. No. 8-69161), the Financial Industry Regulatory Authority ("FINRA") (CRD No. 165429) and state securities regulators throughout the United States.

Defendant ETC is a (newly) wholly owned subsidiary of PEAK6, a private investment firm. For purposes of this action, ETC acts as a DTC Custodian that holds custody of the funds and securities of DriveWealth's customers in an omnibus account held in DriveWealth's name. ETC began operation in 2007 and is registered with and subject to the supervision of, *inter alia*, the United States Securities and Exchange Commission (S.E.C. No. 8-67790), FINRA (CRD No. 146122) and state securities regulators throughout the United States.

Defendant Apex is also a securities clearing firm that, upon information and belief, began operations on or about June 6, 2012 following a transaction between Apex Clearing Holdings LLC ("Apex Holdings"), and its affiliates, including Peak6 Investments, LP. Apex is a FINRA member firm (CRD No. 13071).

Defendant PEAK6 is an investment company and direct or indirect owner of both ETC and Apex. PEAK6, through its brokerage division, PEAK6 Capital Management LLC, is registered with and subject to the supervision of, *inter alia*, the United States Securities and Exchange Commission (S.E.C. No. 8-50422), FINRA (CRD No. 43773) and state securities regulators throughout the United States.[3] PEAK6 is an associated person under the FINRA rules.

From 2014 until November 2017, DriveWealth had a DTC Custodian arrangement with Industrial and Commercial Bank of China Financial Services ("ICBCFS"). Starting in November 2017, DriveWealth replaced ICBCFS, deciding instead to utilize the services of ETC. DriveWealth and ETC entered into an Omnibus Disclosed Clearing Agreement dated as of November 1, 2017 (the "2017 OCA").[4] On or about May 14, 2018, DriveWealth completed the transition of its business from ICBCFS to ETC. On or about January 24, 2019, ETC and DriveWealth entered into an addendum to the 2017 OCA which, *inter alia*, increased the Clearing Deposit, but left other fees unchanged from the 2017 OCA. DriveWealth was not happy with, and saw no risk based reason for this addendum, but agreed to it so as to not disrupt the stability of its customers' ability to conduct business in their accounts.[5]

In or about March 2019, ETC and DriveWealth began to renegotiate the terms of the 2017 OCA, and, after five (5) months of negotiations, on or about August 5, 2019, executed a new Omnibus Clearing Agreement (the "August 2019 OCA").[6]

---

[3] Since all parties to this action are FINRA member firms and associated persons, they are required to arbitrate their disputes pursuant to applicable FINRA rules.
[4] The 2017 OCA is attached as Exhibit 1 to the Declaration of Mark Bulger, dated December 13, 2019 (hereinafter the "Bulger Dec.").
[5] Bulger Dec., Ex. 2.
[6] Bulger Dec., Exs. 3-4.

The August 2019 OCA provides for an initial one (1) year term (a "Contract Period"), and that thereafter, the August 2019 OCA would renew for a 1-year "subsequent Contract Period" unless terminated 60 days prior to the conclusion of the "then current Contract Period." Specifically, the August 2019 OCA states as follows, in pertinent part (Bulger Dec., Ex. 3 at 19):

> (a) The parties agree that this Agreement shall be in force for a period of twelve (12) months from the Effective Date ("Contract Period") and that there shall be no change in the pricing schedule referred to in Paragraph 3 herein. Thereafter, the Agreement shall automatically renew for a subsequent Contract Period, unless terminated pursuant to the terms of section 13(b) below.
>
> (b) This Agreement may be terminated by either party, without cause, upon sixty (60) days' written notice to the other party, prior to the expiration of the then current Contract Period. Should Introducing Broker fail to provide timely notice, Introducing Broker may thereafter terminate this Agreement at any time during the Contract Period, but agrees that it shall be liable and will pay to ETC all agreed upon minimums for the remainder of the Contract Period.

From November 2017 up through and early September 2019 – almost 2 years – ETC and DriveWealth performed under the 2017 OCA or August 2019 OCA without event or any material problems.[7] Indeed, just a few weeks before Apex and ETC surfaced in the relationship, the parties had successfully renegotiated the terms of the August 2019 OCA.

On or about September 9, 2019, Defendant PEAK6 acquired ETC and was brought under the control of Defendant Apex, an existing subsidiary of PEAK6 and

---

[7] Bulger Dec., ¶ 17.

a primary competitor to DriveWealth.[8] Apparently, the Defendants saw an opportunity to try to improve revenue. Three days after the ETC acquisition, on September 12, 2019, the CEO of Apex and Chairman of PEAK6 ETC Holdings LLC and advisor to ETC, William Capuzzi, emailed Robert Cortright, the CEO of DriveWealth, stating that "the current pricing for DriveWealth is well below industry standards" and requesting that DriveWealth agree to a revised pricing schedule, with fee increases of up to 2567%, notwithstanding that DriveWealth and ETC had negotiated these prices just one month before.[9] DriveWealth rejected the revised pricing schedule.[10]

On October 1, 2019, William Brennan, CEO of ETC and also a registered employee of Apex, reiterated Defendants' demand that DriveWealth consent to the increases in fees, guaranteed monthly minimums, and security deposits, each well beyond those agreed to in the August 2019 OCA. The terms of the August 2019 OCA clearly do not allow ETC (much less APEX, which is not a party to the OCA) to terminate the agreement prior to the then current Contract Period, by invoking the 60-day notice provision of the August 2019 OCA.[11] DriveWealth would not succumb to those outlandish threats. After the parties were unable to agree to new payment terms, on or about November 15, 2019, DriveWealth advised all Defendants that it would be transitioning its clearing business to Citibank, N.A.[12]

Defendants' predatory ulterior motives quickly became apparent. All parties are well aware that transitioning a clearing business without disruption to the more

---

[8] Bulger Dec., Ex. 5.
[9] Bulger Dec., Ex. 6.
[10] Bulger Dec., Ex. 7.
[11] Bulger Dec., Ex. 9.
[12] Bulger Dec., Ex. 10.

than 1.5 million individual end-users takes time and coordination. On Wednesday November 27, 2019, the day before the Thanksgiving holiday, Defendants' threatened to restrict DriveWealth's access to its account unless the transition was complete by December 13, 2019 – a mere 9 business days later – or if the total assets held in DriveWealth's omnibus account at ETC exceeded $355 million.[13]

Defendants' reiterated their December 13, 2019 demand deadline again on December 2, 2019, and then, after DriveWealth tried to dial back the temperature and neutralize Defendants' ultimatums, DriveWealth proposed entering into a short three (3) or six (6) month contract at Defendants' ransom pricing, to ensure no business disruption while providing reasonable time to effectuate the transition.[14] On Friday December 6, 2019 Defendants' advanced their already arbitrary and capricious deadline from December 13 to December 11. Defendants' have offered no plausible rationale for their specious need to abruptly limit DriveWealth's access to its account, much less than a reason to do so by December 11.[15]  Indeed, DriveWealth anticipates completing the conversion by January 31, 2020.

## ARGUMENT

### A. Interim Relief is Necessary to Preserve the Status Quo of the Parties' Current Contractual Relationship

A "district court may issue interim injunctive relief on arbitrable claims if interim relief is necessary to preserve the status quo and the meaningfulness of the arbitration process—provided, of course, that the requirements for granting injunctive relief are otherwise satisfied." *Toyo Tire Holdings of Am. Inc. v. Continental Tire North Am., Inc.*, 609 F.3d 975, 981 (9th Cir. 2010).

Interim injunctive relief is necessary to preserve the status quo and the

---

[13] Bulger Dec., Ex. 12.
[14] Bulger Dec., Ex. 14.
[15] Bulger Dec., Ex. 15.

meaningfulness of the arbitration process. The purpose of the arbitration is to review the Defendants' conduct and motives and to settle the dispute of whether Defendants can prematurely terminate the Parties' relationship under the August 2019 OCA. Defendants' threats are serious and threaten to put DriveWealth out of business. Any limitations placed on DriveWealth's account will necessarily mean that DriveWealth's introducing brokers ("IBs"), and thus the more than 1.5 million end user customers, will not be able to fully trade their own accounts. Even a temporary inability of this nature will likely result in many of DriveWealth's existing IBs moving to a competitor – potentially to Defendant Apex, while harming DriveWealth's ability to create relationships with new IBs and causing DriveWealth to be unable to service accounts for new and existing retail customers. This inability to fully trade in existing accounts and open new accounts will have a variety of regulatory implications, and will quickly and irreparably destroy DriveWealth's business.

### B. Sufficient Grounds Exist for this Court to Issue a Temporary Restraining Order

To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). To determine whether to issue a TRO, the courts in the Ninth Circuit apply the same analysis used to evaluate a motion for preliminary injunction. *McCarthy v. Servis One, Inc.*, 2017 U.S. Dist. LEXIS 32622, at *9–10 (N.D. Cal. Mar. 7, 2017).

    1. There is a strong likelihood that DriveWealth will succeed on the merits.

In a typical case, the court would require a movant to show that he is more likely than not to succeed on the merits. *SEC v. Banc de Binary, Ltd.*, 964 F. Supp. 2d 1229, 1232 (D. Nev. 2013).

DriveWealth is likely to succeed on the merits because it is clear from the face of the August 2019 OCA that the Parties are bound by the agreement for a period of at least one year. By its own terms, the initial Contract Period of the August 2019 OCA was to run from August 5, 2019 until August 5, 2020.

> (a) The parties agree that this Agreement shall be in force for a period of twelve (12) months from the Effective Date ("Contract Period") and that there shall be no change in the pricing schedule referred to in Paragraph 3 herein. <u>Thereafter, the Agreement shall automatically renew for a subsequent Contract Period, unless terminated pursuant to the terms of section 13(b) below</u>.

> (b) This Agreement may be terminated by either party, without cause, upon sixty (60) days' written notice to the other party, prior to the expiration of the then current Contract Period. Should Introducing Broker fail to provide timely notice, Introducing Broker may thereafter terminate this Agreement at any time during the Contract Period, but agrees that it shall be liable and will pay to ETC all agreed upon minimums for the remainder of the Contract Period.

During that initial Contract Period "**there shall be no change in the pricing schedule.**" Pursuant to the August 2019 OCA, "[t]hereafter" (emphasis added) the 2019 OCA would automatically renew for another year, <u>unless</u> terminated no less than 60 days "prior to the expiration of the then current Contract Period." The August 2019 OCA does not provide for termination during a Contract Period. Rather, the August 2019 OCA allows either party to decline the automatic renewal by providing notice by June 6 (60 days before the end of each Contract Period). ETC has no contractual power to terminate the August 2019 OCA without cause in

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER IN AID OF ARBITRATION
AND MEMORANDUM IN SUPPORT

the middle of a Contract Period and thus ETC is contractually required to provide DriveWealth with clearing services up through and including August 5, 2020. Nonetheless, ETC has threatened to terminate the agreement only 4 months into the August 2019 OCA. As such, DriveWealth is more likely than not to succeed on the merits of its claim that Defendants are not entitled to terminate the August 2019 OCA and deprive DriveWealth of the benefit of its negotiated bargain just a couple of months after inception.

Defendants' October 1, 2019 email stated (emphasis added):

> Please note that the new pricing schedule will become effective in 60 days. <u>To the extent that your contract contains an auto-renewal provision</u>, this constitutes notice of non-renewal or termination as applicable, although we hope our relationship will continue on the new terms.

Defendants' October 1 email by implication admits that ETC would not change the negotiated terms in October. The email was therefore timely (albeit, oddly early) notice that the August 2019 OCA would not automatically renew in August 2020 – nothing more.

      2. <u>There is a strong likelihood that DriveWealth will suffer irreparable harm if this Court does not issue an injunction.</u>

Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages. Because intangible injuries generally lack an adequate legal remedy, intangible injuries may qualify as irreparable harm. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

As explained above, absent any interim injunctive relief, there is a strong likelihood that DriveWealth will suffer irreparable harm. Without the services of a

DTC Custodian, the buy and sell orders placed by the more than 1.5 million customers of IBs that rely on DriveWealth for execution and clearing services would not be executed or completed, and DriveWealth could not conduct its business. DriveWealth stands to lose all of its customers. It is beyond dispute that if brokerage customers cannot access and trade their account, they will move those accounts. Should DriveWealth's business fail, the amount of damages would be intangible.

### 3. The balance of equities tips in DriveWealth's favor.

In assessing whether the plaintiffs have met this burden, the district court has a duty to balance the interests of all parties and weigh the damage to each. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009). The court must evaluate the interim harm the defendants are likely to sustain if the injunction is granted and compare it with the harm the plaintiff is likely to suffer if an injunction does not enter. *De Vico v. United States Bank*, 2012 U.S. Dist. LEXIS 155622, at *22 (C.D. Cal. Oct. 29, 2012).

This factor tips strongly in favor of DriveWealth because Defendants stand to suffer no harm if this Court issues an injunction. Business will go on just as ETC and DriveWealth agreed before Apex and PEAK6 surfaced and disrupted the years old relationship. If the *status quo ante* vis a vis the August 2019 OCA is maintained pending an expedited arbitral resolution of the present dispute, Defendants will suffer no prejudice. They won't collect the exorbitant revenue they seek to extort; they will collect on the negotiated and agreed upon August 2019 OCA terms. Alternatively, DriveWealth can potentially lose its entire client base and the operations of its business as a whole.

Defendants have variously identified three reasons for their purported need to renegotiate the August 2019 OCA: (i) the agreed-upon rates were below market value; (ii) there was a change in the risk profile of the DriveWealth account; and (iii) certainty is needed now that DriveWealth has announced it is changing DTC Custodians. None of these reasons have merit – and certainly none outweigh the potential damage to DriveWealth if Defendants' limit DriveWealth's account access. The purported "reasons" identified by Defendants' for requiring additional fees from DriveWealth are all nonsensical.

First, the agreed-upon rates were negotiated at arms-length, over the span of 5 months, between sophisticated commercial parties. ETC and DriveWealth were able to reach such agreement in the November 2017 OCA, in the January 2019 amendment, and again in the August 2019 OCA and entered into a contract which specifically states that "that there shall be no change in the pricing schedule" during the initial 1-year contract period. The parties are bound by that contract, and cannot force a renegotiation one month later simply because they are acquired by a competitor.

Second, there was no change in DriveWealth's risk profile between August 5, 2019 and September 9, 2019. To the contrary, since 2017 DriveWealth's business has operated in the same manner and without financial, economic or regulatory incident.[16] DriveWealth's customers never defaulted or reneged on any trades and there was no rogue trading. No customer complaints or arbitrations were threatened, much less commenced.[17] DriveWealth's business has always been low risk for its

---

[16] Bulger Dec., ¶¶ 17-18.
[17] Bulger Dec., ¶ 16.

14
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER IN AID OF ARBITRATION
AND MEMORANDUM IN SUPPORT

DTC Custodian.  The majority of DriveWealth's business is from customers who buy and pay for quality securities in cash accounts governed by Regulation T, 12 CFR §220.  ETC has little to no risk on these amounts.  Only a *de minimus* portion of the assets under management by DriveWealth are in margin accounts, and that range has not changed.  Moreover, if Defendants' were actually concerned about their risk and exposure, the tool to mitigate risk is to collect additional security, not increase minimum monthly payments. Finally, if Defendants' were actually concerned about their risk, they would seek to shorten, not extend DriveWealth's affiliation with ETC.  Instead, Defendant's rejected that offer and wanted DriveWealth to commit to an additional 12 months.  This tactic clearly shows that Defendant's risk based argument is bogus.

Third, Defendants' purported desire for an additional 12 months in order to have "certainty" of DriveWealth's exit date, now that DriveWealth has announced its departure, is similarly meritless.  To start, DriveWealth did not initiate this dispute.  Rather, DriveWealth was forced to convert to Citibank *because* of Defendants' actions.  In any event, DriveWealth has offered certainty.  DriveWealth has advised that it anticipates completing the conversion by the end of January 2020, and offered to enter into a 3 or 6 month contract – at the new rates – in order to provide the certainty that Defendants' claim they need.  The rejection of that offer belies any suggestion that Defendants' actions are anything but predatory and designed to damage its competition.

Finally, and importantly, Defendants' alleged risk is compensable. Defendants' demand is that DriveWealth enter into a 12-month contract with a monthly minimum payment of $50,000 – for a total of $600,000.  That amount –

and nothing more – is what they claim they would be owed for being forced to continue to do business with DriveWealth. DriveWealth, on the other hand, faces the risk of losing its business if it is unable to effectuate trades on behalf of the more than 1.5 million account holders. The balance of equities mandates a short TRO allowing the FINRA arbitration to proceed, and in the interim, the conversion to complete.

    4. <u>An injunction preserving the status quo is in the public interest.</u>

The public interest inquiry primarily addresses the impact on nonparties rather than on the parties. *CTIA - Wireless Ass'n v. City of Berkeley*, 854 F.3d 1105, 1124 (9th Cir. 2017). It embodies the U.S. Supreme Court's direction that, in exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. *Id.*

Here, an injunction is in the public interest because it will help avert collateral damage to Plaintiff's customer accounts. If DriveWealth is given time to make the changes that will be required, as opposed to having to deal with an untimely interruption in service, its customers will not be affected by the changes. However, if Defendants terminate the relationship before Defendant's are able to effectively limit the repercussions, more than 1.5 million retail customers, and the numerous FINRA members and SEC Registered Investment Advisors that rely on DriveWealth for clearing and execution services, stand to suffer.

Additionally, Defendants, and specifically Apex, should be enjoined from their actions, as this appears to be a routine practice and has the potential to affect others in the future. They have previously been enjoined from arbitrarily raising rates in strikingly similar circumstances only a few years ago. In *TradeKing, LLC v.*

*Pension Financial Services Inc. and Apex Clearing Corp.*, N.Y.S. Sup. Ct., Index No. 652036/2012, after negotiating a clearing agreement with Plaintiff TradeKing, LLC, Apex attempted to unilaterally and abruptly raise fees and deposits, and threatened account restrictions if TradeKing failed to acquiesce. The Court immediately recognized Apex's predatory business practices and implemented a temporary restraining order to allow the FINRA arbitration to be conducted. *See also Zecco Trading, Inc. v. Apex Clearing Corporation, Penson Financial Services, Inc., and Optionshouse, LLC*, Index No. DC-12-06676 (TRO against APEX arising out of similar facts).[18]

As such, a balance of these factors weighs in favor of DriveWealth and sufficient grounds exist for this court to issue a TRO.

### C. There Is No Need For A Bond

The district court has wide discretion to eliminate the need for a bond. *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir. 1999). In fact, "[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003); *see Pyro Spectaculars N., Inc.*, 861 F. Supp. 2d at 1098 (same); *McNamara*, 2011 WL 2117546, at *8 (citing *Jorgensen*) (declining to issue bond requested by defendants).

Here, DriveWealth has demonstrated an overwhelming likelihood of success on its claims and has made a clear showing of ongoing and irreparable harm. The requested injunctive relief will not impede or prevent Defendants from

---

[18] Boykins Dec. Exs. C, D.

17
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER IN AID OF ARBITRATION AND MEMORANDUM IN SUPPORT

conducting business. Rather, the requested injunctive relief will narrowly enjoin Defendants from disrupting the status quo of its contractual relationship with DriveWealth. Accordingly, DriveWealth respectfully requests that the Court either dispense with the bond requirement or, at most, require a nominal bond.

## CONCLUSION

For all the reasons set forth in this memorandum of law, along with Plaintiffs' supporting affidavits, Plaintiff faces nothing short of the destruction of its business unless this Court temporarily restrains and enjoins Defendants, and all those acting in active concert with them, directly or indirectly, from taking any action during the pendency of the Arbitration that would otherwise interfere with Plaintiff's right to continue to conduct its business and to obtain services under the August 2019 OCA in the same manner as it has done since the inception of the August 2019 OCA.

The Court should grant Plaintiffs a temporary restraining order in advance of a scheduled preliminary injunction hearing before this Court. Moreover, since the FINRA arbitration rules contemplate the commencement of an expedited permanent injunction hearing no later than 15 days after the issuance of preliminary injunctive relief that might be ordered by this Court, it presumably makes sense for the Court to abstain from actually conducting such a preliminary injunction so as to enable the mandatory FINRA arbitration to reach a final determination as to the merits, which may well occur even before the Court is able to convene a full preliminary injunction hearing.

DATED: December 13. 2019

KELLEY DRYE & WARREN LLP
Tahir L. Bovkins

By: */s/ Tahir L. Boykins*
Tahir L. Boykins
Attorneys for Defendant
DriveWealth, LLC