| | | |
|---|---|---|
| UNITED STATES DISTRICT COURT<br>CENTRAL DISTRICT OF CALIFORNIA<br>CIVIL MINUTES—GENERAL | | JS-6 |

| Case No. | **CV 19-10550-DMG (Ex)** | Date | December 23, 2019 |
|---|---|---|---|
| Title | *DriveWealth, LLC v. Electronic Transaction Clearing, Inc., et al.* | Page | 1 of 9 |

Present: The Honorable   DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

**Proceedings: IN CHAMBERS - ORDER RE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [3]**

## I.
## BACKGROUND

This matter is before the Court on Plaintiff DriveWealth LLC's Motion for a Preliminary Injunction ("MPI"). [Doc. # 3.] Plaintiff seeks to prevent Defendants from violating the terms of an agreement between Plaintiff and Defendant Electronic Transaction Clearing, Inc. ("ETC") during the pendency of FINRA arbitration between the parties. *See* Notice of Motion at 1 [Doc. # 3]. The Court granted Plaintiff's request for a Temporary Restraining Order on December 13, 2019. [Doc. # 8 ("TRO").] Defendants ETC, Apex Clearing, Inc., and PEAK6 Investments, LLC have opposed Plaintiff's MPI. [Doc. ## 12 ("Opp."), 15 (construing Defendants' *ex parte* application to vacate the TRO as an opposition to the MPI).]

Plaintiff is a clearing firm and broker-dealer that provides a platform for securities trading. Bulger Decl. at ¶ 8 [Doc. # 3-7]. In November 2017, Plaintiff entered into an Omnibus Clearing Agreement ("2017 OCA") with ETC whereby ETC agreed to act as Plaintiff's Depository Trust and Clearing Custodian ("DTC Custodian").[1] Plaintiff fully transitioned its business to ETC in May 2018. *Id.* at ¶ 16. In March 2019, Plaintiff and ETC began renegotiating the OCA and executed a finalized OCA in August 2019. *Id.* at ¶ 19, Ex. 3 ("2019 OCA"). The 2019 OCA included an agreed-upon pricing schedule for various fees. *Id.* at ¶ 20, Ex. 4. It also included the following provision:

---

[1] A DTC Custodian is "necessary to hold the securities that are traded, and DriveWealth maintains an account with such DTC Custodian on an omnibus basis. Without the services of a DTC Custodian, the buy and sell orders placed by [the end-user customers of DriveWealth's customers] would not be executed or completed, and DriveWealth could not conduct its business." Bulger Decl. at ¶ 13.

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT  JS-6
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | |
|---|---|
| Case No. **CV 19-10550-DMG (Ex)** | Date December 23, 2019 |
| Title *DriveWealth, LLC v. Electronic Transaction Clearing, Inc., et al.* | Page 2 of 9 |

> (a) The parties agree that this Agreement shall be in force for a period of twelve (12) months from the Effective Date ("Contract Period") and that there shall be no change in the pricing schedule referred to in Paragraph 3 herein. Thereafter, the Agreement shall automatically renew for a subsequent Contract Period, unless terminated pursuant to the terms of section 13(b) below.
>
> (b) This Agreement may be terminated by either party, without cause, upon sixty (60) days' written notice to the other party, prior to the expiration of the then current Contract Period. Should Introducing Broker fail to provide timely notice, Introducing Broker may thereafter terminate this Agreement at any time during the Contract Period, but agrees that it shall be liable and will pay to ETC all agreed upon minimums for the remainder of the Contract Period.

*Id.* at ¶ 21, Ex. 3 at § 13 ("Section 13").

      On September 9, 2019, PEAK6 acquired ETC and brought it under the control of Apex, a PEAK6 subsidiary and a direct competitor of Plaintiff. *Id.* at ¶¶ 22, 23 Ex. 5. Three days later, Apex's CEO contacted Plaintiff's CEO and asked Plaintiff to agree to "huge . . . fee increases" associated with Plaintiff's relationship with ETC despite the fact that Plaintiff and ETC had agreed to a mutually-negotiated fee schedule weeks earlier. *Id.* at ¶ 24, Ex. 6. Defendants contend that these increases merely brought the parties' arrangement "in line with industry standards." Brennan Decl. at ¶ 24 [Doc. # 11-1]. After Plaintiff rejected the fee increases, Apex's CEO threatened to terminate the 2019 OCA if Plaintiff did not agree to the increases. Bulger Decl. at ¶ 26, Ex. 8. ETC's president then sent an email on October 1, 2019 purporting to terminate the 2019 OCA and stating that the new fees would go into effect in 60 days. *Id.* at ¶ 27, Ex. 9.

      After weeks of negotiating over a solution to the parties' disagreement concerning the fee increases, Plaintiff informed Defendants in mid-November 2019 that "DriveWealth would transition its clearing business to Citibank, N.A." *Id.* at ¶ 30. Defendants characterize this period of time as Plaintiff "d[oing] little to transition its account from ETC." Opp. at 8. In response, ETC acknowledged that "de-conversions" (or transitions from one clearing firm to another) "take time and effort," but nonetheless informed Plaintiff on November 27, 2019 that Defendants would "take steps to disrupt DriveWealth and its customers if the conversion is not

UNITED STATES DISTRICT COURT  JS-6
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  **CV 19-10550-DMG (Ex)**     Date  December 23, 2019

Title  ***DriveWealth, LLC v. Electronic Transaction Clearing, Inc., et al.***     Page  3 of 9

completed by December 13, 2019," nine business days later.[2] Bulger Decl. at ¶¶ 31, 32, Exs. 11, 12. Defendants characterize this email as an attempt to "be cooperative and avoid impacting end customers" by accommodating Plaintiff's account activity until December 13 so long as Plaintiff did not increase its account's assets. Brennan Decl. at ¶ 34.

Plaintiff took the position that the 2019 OCA did not give Defendants the right to terminate the agreement on such an expedited schedule, but nevertheless proposed a three-to-six-month contract at Defendants' proposed fee rates "in an effort to protect itself and its customers." Bulger Decl. at ¶ 35. Defendants rejected that offer, demanded a one-year contract, and advanced its December 13 deadline to December 11, 2019. *Id.* at ¶¶ 25, 26, Exs. 14, 15.

Plaintiff then sought recourse from the Supreme Court of the State of New York, which issued a TRO on December 10, 2019. *See* New York TRO [Doc. # 3-3.] That Order stated that:

> pending the hearing in the State or Federal Court in Los Angeles, California on this order to show cause, Respondents, and all those acting in active concert with them, directly or indirectly, shall be enjoined from taking any action during the pendency of the Arbitration that would otherwise interfere with Petitioner's right to continue to conduct its business and to obtain services under the August 2019 OCA in the same manner and at the same fees as it has done since the inception of the August 2019 OCA. This paragraph shall expire on 12/16/19 at 11:00pm, EST unless extended by order of the California Court.[3]

New York TRO. This Court issued a TRO on December 13, 2019 that enjoined Defendants from taking such action until the December 23, 2019 hearing on the instant request for a preliminary injunction.

---

[2] Defendants now claim that deconverting Plaintiff's account should have been "relatively straightforward" and imply that it would not take a significant amount of time. Brennan Decl. at ¶ 31.

[3] Defendants assert that the New York court did not consider the merits of the case because the 2019 OCA has a California forum selection clause. Opp. at 10. They argue that the court instead granted short-term interim relief so that Plaintiff could file this action in the correct forum. *Id.* That may be true, but it does not change the impact of that court's decision, which prevented Defendants from taking action until this Court rules on interim relief.

UNITED STATES DISTRICT COURT　　　　JS-6
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-10550-DMG (Ex)** | Date | December 23, 2019 |
|---|---|---|---|
| Title | ***DriveWealth, LLC v. Electronic Transaction Clearing, Inc., et al.*** | Page | 4 of 9 |

## II.
## LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs the issuance of TROs and preliminary injunctions, and courts apply the same standard to both. *See Credit Bureau Connection, Inc. v. Pardini*, 726 F. Supp. 2d 1107, 1114 (E.D. Cal. 2010) (citing *Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)). Plaintiffs seeking injunctive relief must show that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)). An injunction is also appropriate when a plaintiff raises "serious questions going to the merits," demonstrates that "the balance of hardships tips sharply in the plaintiff's favor," and "shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (quoting *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)).

## III.
## DISCUSSION

**A.　Likelihood of Success on the Merits**

As Defendants point out, the "[l]ikelihood of success on the merits is the most important factor" in the preliminary injunction analysis. *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018), *cert. denied sub nom. Little Sisters of the Poor Jeanne Jugan Residence v. California*, 139 S. Ct. 2716 (2019). It appears that the parties' dispute boils down to whether the 2019 OCA permits ETC to terminate the parties' relationship, increase fees, and impose account restrictions. The Court concludes that Plaintiff, at the very least, raises serious questions going to the merits of whether the 2019 OCA permits such behavior.

Defendants' contentions to the contrary are as follows: (1) ETC successfully terminated the 2019 OCA through the October 1, 2019 email; and (2) even if the 2019 OCA remained effective, it permitted ETC to act as it did. Neither argument is sufficiently persuasive to eliminate all serious questions about this inquiry.

Defendants employ some creative contract interpretation to argue that the October 1 termination email was consistent with Section 13, but the 2019 OCA itself belies that position. It is black letter law that "[c]ontract terms are to be given their ordinary meaning, and whenever

UNITED STATES DISTRICT COURT JS-6
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-10550-DMG (Ex)** | Date | December 23, 2019 |
|---|---|---|---|
| Title | ***DriveWealth, LLC v. Electronic Transaction Clearing, Inc., et al.*** | Page | 5 of 9 |

possible, the plain language of the contract should be considered first." *Starrag v. Maersk, Inc.*, 486 F.3d 607, 616 (9th Cir. 2007) (internal quotations and brackets omitted). Defendants focus on Section 13(b)'s language that "[t]his Agreement may be terminated by either party, without cause, upon sixty (60) days' written notice to the other party, prior to the expiration of the then current Contract Period." Opp. at 13 (citing Section 13(b)). The Court cannot look at Section 13(b) in a vacuum, however, because Defendants' argument ignores the preceding language in Section 13(a). That section plainly states that the "Agreement *shall be in force* for a period of twelve (12) months from the Effective Date ("Contract Period") and that there shall be no change in the pricing schedule" upon which ETC and Plaintiff agreed. Section 13(a) (emphasis added). Only "*[t]hereafter*" does the 2019 OCA renew for a "subsequent Contract Period, *unless*" a party terminates "pursuant to the terms of section 13(b)." *Id.* (emphasis added). In other words, Plaintiff and ETC agreed in August 2019 not to change the pricing schedule for a period of 12 months. They also agreed that either party could terminate the *subsequent contract period* with 60 days advance notice pursuant to Section 13(b). Defendants' dissection of Section 13(b)'s language does nothing to explain away Section 13(a)'s 12-month freeze on the parties' pricing schedule. *See* Opp. at 13 (arguing that the comma between "party" and "prior" in Section 13(b) permits ETC to terminate the 2019 OCA *at any time* that is at least 60 days prior to the end of the Contract Period).

Defendants' interpretation of Section 13(b) would render the 12-month pricing schedule in Section 13(a) a nullity. Taken to its logical extreme, Defendants could pull the rug out from under the 12-month pricing schedule the day after it became effective by giving notice of its termination of the contract. This would be an absurd result for a commercial contract. *Roden v. AmerisourceBergen Corp.*, 186 Cal. App. 4th 620, 651 (2010) ("[W]e must interpret a contract in a manner that is reasonable and does not lead to an absurd result."); *Hillman v. Leland E. Burns, Inc.*, 209 Cal. App. 3d 860, 868 (1989) ("We reject this argument because it also would lead to an absurd result, which is to be avoided in the interpretation of the contract.").[4]

Defendants' reliance on Section 13(h) fares no better. That section states that if Plaintiff "terminates this Agreement pursuant to subparagraph (b) above within the first Contract Period, or ETC terminates this Agreement pursuant to subparagraph (c) or (d) above, [Plaintiff] will pay to ETC a termination fee equal to all agreed upon minimums that would have been due to ETC for the remainder of the Contract Period. Section 13(h). That language, however, does not control this dispute. Plaintiff did not terminate the agreement, so Section 13(h)'s first clause does not apply. ETC purports to have terminated the agreement, but it did not do so under

---

[4] The 2019 OCA contains a choice of law provision that requires the Court to apply California law to all disputes arising out of the agreement. *See* 2019 OCA at § 14(D).

UNITED STATES DISTRICT COURT **JS-6**
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-10550-DMG (Ex)** | Date | December 23, 2019 |
|---|---|---|---|
| Title | ***DriveWealth, LLC v. Electronic Transaction Clearing, Inc., et al.*** | Page | 6 of 9 |

Sections 13(c) or (d). Section 13(c) applies "in the event either party defaults in the performance of its obligations under this Agreement." *See* Section 13(c). Plaintiffs do not appear to have defaulted on any of its obligations under the 2019 OCA before Defendants sent the October 1, 2019 email. Section 13(d) applies "in the event that the [non-terminating] party is criminally indicted, enjoined, disabled, suspended, prohibited, or otherwise unable to engage in the securities business. *See* Section 13(d). No such events have transpired here.

Moreover, in California, a contract's meaning must be derived, if possible, from the whole contract and individual provisions must be interpreted together "in order to give effect to all provisions" and avoid rendering some meaningless. *Maples v. SolarWinds*, Inc., 50 F. Supp. 3d 1221, 1228 (N.D. Cal. 2014) (quoting *Zalkind v. Ceradyne, Inc.*, 194 Cal. App. 4th 1010, 1027 (2011)). Even if Section 13(h) *did* apply here, it would be possible to read sections 13(a), (b), and (h) as consistent with one another without rendering any of them meaningless. Section 13(a)'s first sentence sets forth an initial 12-month period wherein the pricing schedule is unchangeable. Section 13(a)'s second sentence and Section 13(b) permit parties to terminate the agreement in advance of the second contract period (or any further contract periods) at least 60 days in advance. And Section 13(h) provides that, in the event of a qualifying termination, the terminating party must pay a fee in the amount of however many minimum monthly payments remain under the current contract period. This reading permits each provision to retain its meaning. It also supports Plaintiff's position.

Defendants also argue that, *because* its termination of the 2019 OCA was consistent with Section 13, it was entitled to "impose reasonable limitations upon [Plaintiff's] activities with respect to its accounts at ETC." Opp. at 14; *see also* Section 13(b). As Plaintiff points out, however, this argument assumes that Section 13 permitted ETC to terminate the 2019 OCA in the manner it did. But, as discussed above, Plaintiffs are likely to be able to show that Section 13 allowed no such thing. Defendants' position also assumes that the fee increases and account limitations that it has threatened to impose are "reasonable." Plaintiff's position is that they are not. Indeed, this particular disagreement is at the core of the dispute that the parties both appear willing to arbitrate. While the record before the Court is insufficient to permit a determination at this stage as to whether Defendants' restrictions on Plaintiff's account are "reasonable" as a matter of law or industry practice, Plaintiff has done enough to raise at least serious questions going to the merits of that inquiry.

Defendants also argue that, even if the 2019 OCA remains in effect, Section 5(B) permits them to "impose position and/or concentration limits on the Account, to restrict trading to liquidating orders or cash transactions only, or to prohibit certain trading strategies or trading of certain securities or types of securities." Opp. at 14-15 (citing Section 5(B)). Plaintiff does not

UNITED STATES DISTRICT COURT  JS-6
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-10550-DMG (Ex) | Date | December 23, 2019 |
|---|---|---|---|
| Title | *DriveWealth, LLC v. Electronic Transaction Clearing, Inc., et al.* | Page | 7 of 9 |

respond to this argument. *See* Reply. The 2019 OCA does not limit Section 5(B)'s applicability to post-termination dealings—it appears to apply to the parties' relationship at all times. While none of Section 5(B)'s language allows Defendants to change the agreed-upon pricing schedule, it arguably permits ETC to cap the equity and trading activity in Plaintiff's account. Nonetheless, the record at this stage is inadequate for the Court to determine whether Defendants' actions qualify as permissible Section 5(B) limitations. Accordingly, a serious question going to the merits also exists as to whether Section 5(B) authorizes Defendants' actions, and whether those actions are consistent with the covenant of good faith and fair dealing inherent in all contracts. *See Steiner v. Thexton*, 48 Cal. 4th 411, 419 (2010) ("all contracts impose a duty of good faith and fair dealing").

Plaintiff has therefore done enough to satisfy the first prong of the preliminary injunction analysis.

**B.      Likelihood of Irreparable Injury**

Defendants argue that Plaintiff would not face irreparable harm absent interim injunctive relief because: (1) Plaintiff has had ample time to deconvert its account to another DTC Custodian (meaning that Plaintiff's own delay has caused any harm that it has suffered); and (2) Plaintiff faces only "incremental" fee increases under Defendant's new pricing schedule, which in turn translate to increased operating costs, but not any non-monetary harm.

Defendants' own correspondence with Plaintiff undercuts its first argument. As discussed above, ETC has acknowledged that "deconversions take time and effort." Bulger Decl., Ex. 11. Indeed, it appears that Plaintiff's last deconversion took about nine months to complete. Bulger Decl. at ¶ 37. Defendants have given Plaintiff far less time than that to deconvert its account to Citibank. In short, there is no evidence in the record supporting the position that Plaintiff could have, or should have, been able to accomplish a full deconversion as of the date of this Order.

Defendants' second argument also appears factually untrue. Defendants' proposed new price increases reflect *exponential*, rather than incremental, fee increases. Bulger Decl. at ¶ 28, Ex. 9 (showing increases ranging from 100% to 2567%). Defendants also threatened to limit trading in Plaintiff's account and require Plaintiff to submit "additional deposits." Bulger Decl., Exs. 12, 15. While these harms may appear only monetary on their face, they also affect Plaintiff's competitive standing when taken in context. After Defendants' merger, ETC is now a subsidiary of Apex, one of Plaintiff's direct competitors. It is therefore likely that ETC's forced fee increases and limitations on Plaintiff's account will cause Plaintiff to become weaker

UNITED STATES DISTRICT COURT  
CENTRAL DISTRICT OF CALIFORNIA  
CIVIL MINUTES—GENERAL

JS-6

| | | | |
|---|---|---|---|
| Case No. | CV 19-10550-DMG (Ex) | Date | December 23, 2019 |
| Title | *DriveWealth, LLC v. Electronic Transaction Clearing, Inc., et al.* | Page | 8 of 9 |

commercial competition for Apex and cause Plaintiff's customers to reconsider where to take their business. Because, as the Court noted in its previous Order, the loss of goodwill and competitive standing constitute irreparable harm, Plaintiff has satisfied this prong. *See* TRO at 2 (citing *Am. Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009)).

### C. Balance of Hardships

The balance of hardships also favors preliminary injunctive relief. Defendants first argue that this factor weighs in their favor because ETC properly terminated the 2019 OCA in October. Opp. at 17. As discussed above, Plaintiff has adequately shown serious questions going to the merits of that inquiry. They next argue that granting injunctive relief would cause them harm by guaranteeing that Plaintiffs receive "below market pricing" for the duration of the injunction. Opp. at 18. But ETC *negotiated* the pricing schedule in the 2019 OCA. The fact that ETC's new management is unhappy that the agreed-upon fees may be below market rates does not make ETC a victim of its own negotiations and agreement. That is not how contracts work. Defendants also argue that injunctive relief would "effectively resolve[] the issue in dispute in favor of Plaintiff without hearing from Defendants." *Id.* A preliminary injunction does not conclusively resolve any issues in this case—it merely maintains the *status quo* that existed before Defendants began their efforts to modify the 2019 OCA until the arbitration that both sides seek can take place. In short, Defendants' arguments do not persuade the Court to depart from its previous ruling that the balance of hardships tips sharply in Plaintiff's favor. *See* TRO at 2.

### D. The Public Interest

Defendants dismiss Plaintiff's contention that its customers will be harmed by Defendants' actions absent injunctive relief by concluding that Plaintiff is only "at risk of having to (1) pay commercially reasonable prices for its clearing services or (2) stop dragging its feet in transitioning its account to Citibank." Opp. at 18. These arguments are unconvincing for the reasons stated above. Defendants also argue that the public interest counsels against injunctive relief because Plaintiff's account poses too much risk for ETC to handle, and that if Plaintiff's trades fail, ETC's customers will suffer. But there is no evidence in the record that Plaintiff's trades are in any danger of failing. Indeed, Plaintiff submits evidence that ETC has never previously been concerned about the viability of Plaintiff's trades and has never had to draw

UNITED STATES DISTRICT COURT JS-6
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 19-10550-DMG (Ex)** | Date | December 23, 2019 |
| Title | *DriveWealth, LLC v. Electronic Transaction Clearing, Inc., et al.* | Page | 9 of 9 |

against the clearing deposit that Plaintiff gave to ETC as a condition of their OCAs.[5] Suppl. Bulger Decl. at ¶¶ 6-8. Because Defendants' complained-of public interest harm is speculative, and Plaintiff's complained-of public interest harm appears concrete and likely, this factor tips in favor of injunctive relief.

### E. Bond Requirement

The Court previously ruled that Plaintiff need not post any bond as a condition of obtaining interim injunctive relief. TRO at 3. Since the parties did not elaborate in their subsequent briefing on the need (or lack thereof) for a bond, the Court need not disturb its previous conclusion that a bond is unnecessary.

### IV. CONCLUSION

In light of the foregoing, Plaintiff's MPI is **GRANTED**. Defendants, and those acting in concert with them, are hereby enjoined from taking any action that would interfere with Plaintiff's right to continue to conduct business under the 2019 OCA's terms and pricing schedule during the pendency of FINRA arbitration between the parties over the dispute giving rise to this action.[6] The parties shall act expeditiously to complete the FINRA arbitration.

Both sides represented at the hearing on this matter that there is no reason not to stay this action until the FINRA arbitration concludes. Accordingly, this action is hereby **STAYED** and placed into inactive status until the completion of arbitration. The parties shall file a Joint Status Report within 10 days after the conclusion of the FINRA arbitration and notify the Court whether this action should be reopened and the stay lifted.

**IT IS SO ORDERED**.

---

[5] Defendants point to one recent large trade in Plaintiff's account wherein an investor purchased $6.6 million in stock in a Brazilian bank. Opp. at 9. Defendants speculate that if that trade fails, ETC will suffer financial harm. But Defendants present no evidence that the trade is in any danger of failure other than their counsel's unsupported assertion that the "DTCC" considers trades of that nature to be "risky." *Id.* at 10 n.5.

[6] This preliminary injunction does not prevent the parties from voluntarily entering into a settlement agreement or confirming their mutual understanding of the 2019 OCA terms to which they agree.